**In re C.A. QUEENER.**

**Appeal No. 85–2084.**

United States Court of Appeals, Federal Circuit.

July 21, 1986.

Charles E. Rohrer, Intern. Business Machines Corp., Boulder, Colo., argued, for appellant. With him on brief was Elliott Pollack, Pollack, Vande Sande and Priddy, Washington, D.C.

John W. Dewhirst, Associate Solicitor, U.S. Patent and Trademark Office, Arlington, Va., argued, for appellee. With him on brief were Joseph F. Nakamura, Solicitor and Fred E. McKelvey, Deputy Solicitor.

Before DAVIS, Circuit Judge, MILLER, Senior Circuit Judge, and NEWMAN, Circuit Judge.

PER CURIAM.

This is an appeal from the decision of the U.S. Patent and Trademark Office ("PTO") Board of Appeals ("board") sustaining the examiner's rejection of claims 1, 2, 4, 6, and 10 of appellant's reexamination application[1] for obviousness under 35 U.S.C. § 103. We affirm.

## BACKGROUND

The claims in issue are derived from patent 3,647,293 ("'293") originally filed December 1, 1970, issued March 7, 1972, to Queener and assigned to IBM Corp. In response to one of IBM's licensee's discovery and proffer of a prior art reference, IBM submitted the Queener '293 for voluntary reexamination. The claims (both Queener '293 claims and the proposed new claims) are directed to an electrophotographic apparatus (a photocopier) utilizing the xerographic process. We describe the prior art and the Queener invention only to

---

1. *Ex Parte Queener,* Reexamination No. 90/000339, Appeal No. 603–42 (PTO Bd. App. Dec. 27, 1984).

the extent necessary to understand the issues.[2]

*The Prior Art*

The six basic steps in the xerographic process are charging, imaging, developing, transferring, cleaning, and fusing, which all occur in turn on photoreceptive material.[3] Originally the photoreceptor was a plate, but may now be any of a variety of receptor types, the most common being a cylinder or a drum; until about 1970, the photoreceptor was rotated to move the processed portion from one processing station to another.

At the first station, the photoreceptor was charged by passing it under a charge-generating corona (charge corona). The photoreceptor was then moved to an imaging station where it was exposed to light reflected from the document to be copied, thereby acquiring a charge pattern (a latent image of the document). In this charge pattern, the charge was greatest on the areas which, on the original document, were shaded. The latent image was then developed by the deposition (called "cascading") of black powder (toner) onto the imaged photoreceptor area. Toner carries a charge opposite the charge pattern on the imaged area. Thus, the shaded areas of the original document received heavier toner deposits; the more shaded the heavier the deposition. From the developing station the photoreceptor was moved to a transferring station, where a receiving medium (usually copy paper) was placed in contact with the developed image. At this point, a charge opposite that of the toner was placed at the back of the receiving medium so that, when stripped from the photoreceptor, the receiving medium retained the toner. It was then necessary to clean the photoreceptor of residual toner, which was not transferred to the receiving

medium, for use in the next cycle of reproduction. Before the cleaning step, the photoreceptor was typically passed through a preclean station, at which a charge generator neutralized the charged areas and an erase lamp discharged any remaining charge. The cleaning itself was done with various materials, e.g., a bristled brush, with suitable triboelectric characteristics.

These devices were termed "one-cycle" machines because they produced one copy per cycle. During the one cycle, the photoreceptor passed through separate development and cleaning stations. The problems with the one-cycle machine were, *inter alia,* that (1) the separate stations for the developing and cleaning processes were bulky and were costly to manufacture and maintain, and (2) the residual toner, removed from the photoreceptor at a different station from that at which it was deposited, could not easily be recycled for use.

The Cade *et al.* patent (filed December 31, 1968, issued March 14, 1972, to Cade and Volkers, assigned to Xerox Corp.) ("Cade"), discloses an electrophotographic copier possessing "simultaneous" developing and cleaning functions at a single station. Although Cade is directed primarily to a one-cycle copier (and its claims do not explicitly refer to a two-cycle copier), the specification also states that the system described can be used in a two-cycle process. In such case,

the development occurs during the first cycle and the cleaning occurs during the second cycle, which cycle is solely for the purpose of removing residual toner images from the electrostatic latent image support surface. ... [T]he two-cycle system achieves all of the objects of the preferred inventive system, except that the recycling may involve slightly more

---

**2.** A more complete and technical description of the xerographic process is found in the Queener '293 and the Cade *et al.* (3,649,262, described *infra*) patents (and references cited therein), and the 1942 xerographic patent to Carlson (2,297,691). An interesting and brief nontechnical history of xerography is set forth in Owen,

*Copies in Seconds,* Atlantic Monthly, February, 1986, at 64.

**3.** Photoreceptive or photoconductive material is an insulator and will hold an electrical charge in the dark, but becomes a conductor and dissipates the charge when exposed to light.

complicated mechanisms and electrical circuits.

Cade, col. 12, ll. 71–75, col. 13, ll. 1–3.

*The Queener Invention*

Queener '293 teaches a "two-cycle" copier which includes a single developing and cleaning station at the photoreceptor and which operates by alternating the developing and cleaning cycles. By providing a combined developing-cleaning station, Queener has sought to obviate the problems associated with a bulky and costly cleaning apparatus, to improve the quality of the copies by reducing the number of passes for cleaning, and to conserve the amount of toner, previously wasted or lost. The '293 patent teaches the necessity of turning off the charge corona unit of the photocopier during the cleaning cycle to neutralize its effect on the residual toner. This is required in the two-cycle machine due to the juxtaposition of the developing-cleaning, charging, and transfer stations. If the charge corona is left on, the toner will not retain the type charge that the cleaner requires.

In addition to the two-cycle improvements, the Queener '293 teaches electrical circuitry (sequencing means) necessary to achieve the alternation between the developing and cleaning cycles.

Claim 1 of Queener's reexamination application is representative (narrowed from its original wording as claim 1 in the '293 patent):

Electrophotographic apparatus for producing [at least one copy] *multiple copies* from an original document and having the customary electrophotographic facilities for charging, imaging, transferring, precleaning, and erasing a photoconductor medium, said photoconductor medium comprising a movable member having an endless surface, comprising:

a combined developer-cleaner unit positioned for engagement with said photoconductor medium at a single station for developing an image on said photoconductor medium in one mode and cleaning said photoconductor medium in another mode; and

means for selectively activating said developer-cleaner unit in one or the other of said modes during operation of the said apparatus[.] *to develop successive images of said original in said one mode in alternating fashion with the cleaning mode.*

(Deletions during reexamination bracketed; additions underscored.)

The board held that Cade would have rendered the Queener claims obvious under 35 U.S.C. § 103 in conjunction with section 102(e). Thus, the decisive issue on appeal is whether the board erred in affirming the examiner's rejection of claims 1, 2, 4, 6, and 10 under section 103 for obviousness.

## DISCUSSION

We hold that the board correctly found that "claim 1 is so broadly drafted as to embrace the disclosed commercially viable two-cycle copier as well as Cade's copier which will operate to produce multiple copies as claimed but is not commercially viable."[4] In other words, the claims now at

---

**4.** The board likewise said:

In our view, there are no substantive differences between the subject matter which is defined by the broadest reasonable interpretation of claim 1, and that which is disclosed by Cade.

and also:

Cade teaches selective activation in the sense that he expressly indicates that development is *selected* to occur "during the first cycle" and cleaning is *selected* to occur "during the second cycle, which cycle is solely for the purpose of removing residual toner images from the electrostatic latent image support surface."

(Emphasis in original.) The board added that the artisan [of ordinary skill] would have been enabled by this disclosure in Cade to make and use a two-cycle copier which would produce at least two copies, i.e., multiple copies, as claimed [by Queener]

and that

[t]he artisan, in view of the Cade disclosure of operating in a two-cycle mode, would be so nearly in possession of a means for controlling the copying system so as to operate in a fashion embraced by claim 1 that Cade nearly anticipates claim 1.

issue do not distinguish over Cade and would have been obvious in view of that reference. Under the rule of *In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985) and *In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed.Cir.1984) —plainly applicable to this reexamination proceeding—that determination is entirely sufficient to dispose of the current appeal. Therefore, the court need not, and does not, concern itself with any other matters (including those pertaining to the "means plus function" provision of 35 U.S.C. § 112).

AFFIRMED.

JACK R. MILLER, Senior Circuit Judge, concurring.

I believe appellant's argument, that the PTO erroneously refused to apply section 112, last paragraph, is reasonable and should not be rejected out of hand or ignored by the majority and Judge Newman's concurring opinions. Such an approach has not been foreclosed by prior opinions of this court. *See In re Mulder*, 716 F.2d 1542, 1549, 219 USPQ 189, 196 (Fed.Cir.1983) and *In re Sweet*, 393 F.2d 837, 841–42, 157 USPQ 495, 499 (CCPA 1968). *See also* Moy, *The Interpretation of Means Expressions During Prosecution*, 68 J. Pat. Off. Soc'y 246, 247 (June, 1986). I do not share Judge Newman's interpretation of this argument of appellant as an attempt to insert into the claim an additional limitation in contravention of section 112, second paragraph; nor does *In re Lundberg*, 244 F.2d 543, 113 USPQ 530 (CCPA 1957), state that section 112, last paragraph, may never be applied. However, the issue is not dispositive because the board correctly interpreted the claim in question.

Also, I would reject the argument proffered by the board, appellant, and the Solicitor, that nonoperativeness or invalidity of a reference precludes its use as prior art under section 103. What a reference suggests depends upon how one of ordinary skill would interpret it.

PAULINE NEWMAN, Circuit Judge, concurring.

I join the court's opinion, and agree that the dispositive issue is the breadth of the Queener claims. However, in view of Senior Judge Miller's interpretation of precedent to hold that the last paragraph of section 112 is reasonably applied, in prosecution before the PTO, so that the claims need not distinguish from the prior art, I write separately to express my concern lest we reopen that closed book. It is now beyond debate that limitations from the specification will not, during examination before the PTO, be imputed to the claims in order to avoid prior art; such limitations must be specifically stated in the claims. The last paragraph of section 112 does not expand the second paragraph of section 112, which requires that the "claims particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention". As stated in *In re Lundberg*, 244 F.2d 543, 548, 113 USPQ 530, 534 (CCPA 1957):

> [N]otwithstanding the [last] paragraph of section 112, it is the language itself of the claims which must particularly point out and distinctly claim the subject matter which the applicant regards as his invention, without limitations imported from the specification, whether such language is couched in terms of means plus function or consists of a detailed recitation of the inventive matter.

This law has been consistently applied. *See, e.g., In re Mulder*, 716 F.2d 1542, 1549, 219 USPQ 189, 196 (Fed.Cir.1983); *In re Sweet*, 393 F.2d 837, 841–42, 157 USPQ 495, 499 (CCPA 1968); *In re Margaroli*, 318 F.2d 348, 351, 138 USPQ 158, 161 (CCPA 1963); *In re Henatsch*, 298 F.2d 954, 957–58, 132 USPQ 445, 448 (CCPA 1962); *In re Arbeit*, 206 F.2d 947, 958, 99 USPQ 123, 131–32 (CCPA 1953); *Siegel v. Watson*, 267 F.2d 621, 623, 121 USPQ 119, 121 (D.C.Cir.1959); *Ex parte Roggenburk*, 172 USPQ 82, 82–83 (Pat.Off.Bd. App. 1970); *Hoelscher v. Johnson*, 122 USPQ 153, 156 (Pat. Off. Bd. Pat. Inter. 1956).

As applied in reexamination, *see In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed.Cir.1984). *See also* P.J. Federico, *Commentary on the New Patent Act*, 35 U.S.C.A. at 26 (1954) (Section 112, last paragraph, "relates primarily to the construction of such claims for the purpose of determining when the claim is infringed ... and would not appear to have much, if any applicability in determining the patentability of such claims over the prior art, that is, the Patent Office is not authorized to allow a claim which 'reads on' the prior art").