**BAXTER INTERNATIONAL, INC. and Baxter Healthcare Corporation, Plaintiffs–Appellants,**

v.

**COBE LABORATORIES, INC. and Cobe BCT, Inc., Defendants–Appellees.**

No. 95–1407.

United States Court of Appeals, Federal Circuit.

July 10, 1996.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Sept. 4, 1996.

Gary W. McFarron, Cook, Egan, McFarron & Manzo, Ltd., Chicago, Illinois, argued for plaintiffs-appellants. With him on the brief were Granger Cook, Jr. and Andrew G. Kolomayets. Of counsel were Paul C. Flattery and Bradford R.L. Price, Baxter International, Inc., Deerfield, Illinois.

Willem G. Schuurman, Arnold, White & Durkee, Austin, Texas, argued for defendants-appellees. With him on the brief were David D. Bahler and Michael S. Metteauer.

Before NEWMAN, LOURIE, and SCHALL, Circuit Judges.

LOURIE, Circuit Judge.

Baxter International, Inc. and Baxter Healthcare Corporation (collectively "Baxter") appeal from the decision of the United States District Court for the Northern District of Illinois holding on summary judgment that the asserted claims of U.S. Patent 4,734,089 are invalid under 35 U.S.C. § 102(b) on the ground of a prior public use. *Baxter Int'l, Inc. v. Cobe Lab., Inc.*, Nos. 89 C 9460, 93 C 3390 (N.D. Ill. June 1, 1995). Because the district court did not err in holding that there were no genuine issues of material fact regarding the disputed public use and because COBE was entitled to judgment as a matter of law, we affirm.

## BACKGROUND

The '089 patent concerns a sealless centrifuge for separating blood into its components. The application for the patent was filed on May 14, 1976 and it therefore had a critical date of May 14, 1975 for purposes of 35 U.S.C. § 102(b). The alleged prior public use involved the activities of Dr. Jacques Suaudeau,[1] who was a research scientist for the National Institutes of Health (NIH). Suaudeau was studying isolated heart preservation by perfusion, which involved the pumping of whole blood and platelet-rich plasma that had been separated from whole blood through a heart. The centrifuge he had been using damaged platelets in the blood and he found that the damage was caused by rotating seals in the centrifuge. He approached Dr. Yoichiro Ito, another scientist at NIH, for advice in solving this problem, and Ito recommended that Suaudeau try using a sealless centrifuge that Ito had designed. Neither Suaudeau nor Ito had any relationship or connection with Herbert M. Cullis, the inventor named in the '089 patent.[2]

Suaudeau had the centrifuge built by the machine shop at NIH using Ito's drawings. Suaudeau balanced the centrifuge with water and then with blood, and tested it, all before the critical date. It was immediately apparent to Suaudeau that the centrifuge worked properly for its original purpose, as a separator, and that the centrifuge separated blood into its components. He also tested the suitability of the centrifuge for his own purposes, by performing experiments in order to determine if the centrifuge would produce platelet-rich plasma with a platelet count satisfactory for perfusion. These tests involved operating the centrifuge for as long as forty-three hours. All of this occurred in Suaudeau's laboratory at the NIH campus in Bethesda, Maryland. Suaudeau also balanced and tested the centrifuge at Massachusetts General Hospital, where he went to work after leaving NIH.

Baxter sued COBE Laboratories, Inc. for infringement of the '089 patent; it later amended its complaint to add COBE BCT, Inc. as a co-defendant (these companies will be collectively referred to as "COBE"). Baxter asserted infringement of claims 1, 2, 4, 5, 7, 9–11, 13, 17, 25, and 26 of the '089 patent, and stipulated that claims 10, 17, and 25 were representative claims. *See Miles Labs., Inc.*

---

1. Dr. Suaudeau was referred to as such in appellants' brief and oral argument, but, because he later became a priest, appellees have referred to him as Father Suaudeau. We use the title he possessed at the time of his actions involved in this case.

2. Ito later filed his own patent application for the centrifuge and that application was placed in interference with Cullis's application. However, the claims of the '089 patent at issue in this case were not part of the interference.

*v. Shandon Inc.*, 997 F.2d 870, 879, 27 USPQ2d 1123, 1129 (Fed.Cir.1993) ("Where the parties stipulate to 'representative' claims, . . . a validity resolution for the representative claims applies to the other claims as well."), *cert. denied,* —— U.S. ——, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994).

The representative claims read in pertinent part as follows:

10. A centrifugal blood processing apparatus for use in conjunction with a flow system including at least one blood processing chamber and a flexible umbilical cable segment having a plurality of integral passageways for establishing fluid communication with said blood processing chamber, said apparatus comprising, in combination:

. . . .

17. The method of centrifugally processing biological fluid with reduced risk of contamination of the fluids of the outside environment using a closed leak-proof envelope which envelope includes an umbilical having input and output at one side thereof and defining passageways there through, which umbilical includes a flexible segment which is capable of repeated axial twisting and untwisting, and which envelope also includes at least one processing chamber connected at the other side of the umbilical which chamber is in communication with the passageways thereof, comprising the steps of:

. . . .

25. A disposable flow system for use in processing fluids in a centrifugal apparatus of the type having a stationary base, an orbiting assembly mounted to the base for orbiting about an axis at a first rotational speed, and a centrifugating rotor assembly for revolving about said axis at twice the rotational speed of said orbiting assembly, said unit comprising:

. . . .

COBE filed a motion for summary judgment of invalidity, asserting that there were no genuine issues of material fact and that the claimed invention had been in public use before the critical date. On December 21, 1994, the district court conducted a hearing.

on COBE's motion. It then held that Suaudeau had publicly used the claimed invention before the critical date and that the use was not experimental. The court stated that "a use by a single person not under the control of the inventor and in public, as that term of art is used, is a[use] sufficient" to invalidate a patent. The court found that the invention here had been reduced to practice before the critical date, and that others at NIH and Mass. General had observed the centrifuge in operation. Regarding Baxter's assertion that Suaudeau's use was experimental, the court stated that "the experimental use exception is limited to the inventor or people working for the inventor or under the direction and control of the inventor," but that neither Suaudeau nor Ito were acting under the direction or control of Cullis, the inventor. Furthermore, the court found that Suaudeau was not experimenting to perfect or test the invention but, rather, was making modifications for his own particular requirements. Accordingly, the district court held that there were no genuine issues of material fact, that the claimed invention had been in public use before the critical date, and that the asserted claims of the '089 patent were invalid. Baxter now appeals.

## DISCUSSION

■■■ Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576–77, 12 USPQ2d 1382, 1383 (Fed.Cir.1989). Thus, summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, we view the evidence in the light most favorable to the party opposing the motion, with doubts resolved in favor of the nonmovant. *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1274, 35 USPQ2d 1035, 1038 (Fed. Cir.1995). The party challenging validity must prove its case by clear and convincing evidence. *Ryko Mfg. Co. v. Nu–Star, Inc.*,

950 F.2d 714, 716, 21 USPQ2d 1053, 1055 (Fed.Cir.1991). We review a district court's grant of summary judgment *de novo. Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994).

Baxter argues that the district erred by not considering the totality of the circumstances or the policies underlying the public use bar. According to Baxter, Suaudeau's use of the centrifuge was not publicly known or accessible, and ethical constraints would have limited or precluded those who saw the centrifuge in operation from disclosing their knowledge of it. Baxter asserts that the most applicable policy involved here is the removal of inventions from the public domain that the public believes are freely available; according to Baxter, the public had no reason to believe that the centrifuge was freely available.

COBE responds that the district court correctly applied the law, considering the relevant policies underlying the public use bar. According to COBE, the centrifuge in Suaudeau's laboratory at NIH and at Mass. General was publicly accessible and those who saw it in operation were under no duty of confidentiality. Furthermore, COBE argues that the relevant policies support the district court's decision, as those who saw the centrifuge in operation would have reasonably believed the centrifuge was publicly available. COBE also asserts that NIH had an interest in continuing to use the technology that its employees, Ito and Suaudeau, began using without restriction before the critical date.

■ Under section 102, a person is entitled to a patent, *inter alia,* unless "the invention was . . . in public use . . . in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (1994). We have described "public use" as including "any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *In re Smith,* 714 F.2d 1127, 1134, 218 USPQ 976, 983 (Fed.Cir.1983) (citing *Egbert v. Lippmann,* 104 U.S. 333, 336, 26 L.Ed. 755 (1881)). Whether a public use has occurred is a question of law. In considering whether a particular use was a public use

within the meaning of section 102(b), we consider the totality of the circumstances in conjunction with the policies underlying the public use bar. *Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192, 1198, 31 USPQ2d 1321, 1324 (Fed.Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995). These policies include:

> (1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.

*Id.* at 1198, 31 USPQ2d at 1324–25.

■ We agree with COBE that there were no genuine issues of fact, that Suaudeau publicly used the invention before the critical date, and that COBE was entitled to judgment as a matter of law. We do agree with Baxter that the most applicable policy underlying the public use bar here is discouraging removal from the public domain of inventions that the public reasonably has come to believe are freely available. However, invalidation of the Cullis patent is not inconsistent with that policy. Suaudeau's use was public, and it was not experimental in a manner that saves Cullis's patent.

The centrifuge that Suaudeau was using met all the limitations of the representative claims of the '089 patent. Suaudeau testified that the centrifuge worked as a separator as soon as he operated it, which verified that it would work for its intended purpose as a centrifugal blood processing apparatus and method as recited in the claims. Suaudeau further testified that others at NIH came into his laboratory and observed the centrifuge in operation, including co-workers, who were under no duty to maintain it as confidential. Nor did Suaudeau make any discernible effort to maintain the centrifuge as confidential. His laboratory was located in a public building, and he testified that he re-

called "people coming and looking, people flowing into the lab" before the critical date. He even testified that NIH had an antisecrecy policy.

Suaudeau's lack of effort to maintain the centrifuge as confidential coupled with the free flow into his laboratory of people, including visitors to NIH, who observed the centrifuge in operation and who were under no duty of confidentiality supports only one conclusion: that the centrifuge was in public use. The record contains clear and convincing evidence to support the conclusion that the asserted claims of the '089 patent are invalid on the ground of Suaudeau's prior public use.

Baxter asserts that those who observed the centrifuge were under an ethical obligation to keep it secret. However, there was no evidence that this was so. According to unrefuted testimony by Suaudeau and Dr. Ronald Yankee, any relevant ethical obligation that existed was to refrain from taking credit for the work of others, or publishing the work of others without permission. Those who observed the centrifuge in operation were under no duty to maintain it as confidential.

Baxter also argues that Ito and NIH did not consider Suaudeau's use to have been a public use. Baxter cites the declaration in Ito's own patent application on the sealless centrifuge, filed under the auspices of NIH. In his declaration, Ito averred that the invention had not been in public use more than one year before the filing date of his patent application. The district court discounted the declaration, stating:

> I regard Ito's declaration as a groundless statement insofar as the evidence before me bears upon its truth or falsity. I don't mean to say that Dr. Ito made a false declaration. That issue is not before me. All I can say is that on the basis of the evidence which is before me, which has been submitted by both sides here, he was clearly wrong when he said that there had been no use of the invention during the period exceeding a year prior to his own application.

The court was correct in discounting this declaration. Ito's averment was a statement of his own appraisal of the relevant facts, made in relation to his own application for patent. It does not bind a court later evaluating those facts, especially in relation to a third party's application for patent. Moreover, the declaration was only one factor to be considered under a totality of the circumstances evaluation. Ito's conclusory statement does not preclude the district court from deciding that the undisputed facts indicated a public use of the claimed invention before the critical date; the court thus did not err in discounting it.

■ Baxter argues that any alleged public use by Suaudeau is negated by the fact that it was experimental use. According to Baxter, Suaudeau's use was not for commercial purposes; it was to determine whether the invention would function as intended. Baxter also argues that Cullis was entitled to the benefit of Suaudeau's experimental use, even though Suaudeau was not acting under the control or direction of Cullis.

COBE responds that the totality of the circumstances does not support a conclusion of experimental use. COBE argues that Suaudeau reduced the invention to practice, which, according to COBE, ends experimental use. COBE argues that the fact that Suaudeau was not acting under the direction or control of the inventor also precludes a conclusion of experimental use. In addition, COBE argues that any testing of the invention by Suaudeau was for his own purposes and that Suaudeau was not experimenting with the claimed invention on behalf of the inventor.

■ Experimental use negates public use; when proved, it may show that particular acts, even if apparently public in a colloquial sense, do not constitute a public use within the meaning of section 102. *TP Labs., Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 971, 220 USPQ 577, 582 (Fed.Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984). The Supreme Court has stated that "[t]he use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as [a public] use." *City of Elizabeth v. American Nicholson*

*Pavement Co.,* 97 U.S. 126, 134, 24 L.Ed. 1000 (1877).

■ An analysis of experimental use, which is also a question of law, requires consideration of the totality of the circumstances and the policies underlying the public use bar. *E.g., Tone Bros.,* 28 F.3d at 1198, 31 USPQ2d at 1324. Evidentiary factors in determining if a use is experimental include the length of the test period, whether the inventor received payment for the testing, any agreement by the user to maintain the use confidential, any records of testing, whether persons other than the inventor performed the testing, the number of tests, and the length of the test period in relation to tests of similar devices. *TP Labs.,* 724 F.2d at 971–72, 220 USPQ at 582; *see also In re Brigance,* 792 F.2d 1103, 1108, 229 USPQ 988, 991 (Fed.Cir.1986).

■ The district court determined as a matter of law that Suaudeau's use was not experimental. It properly determined that Suaudeau was not experimenting with the basic features of the invention, stating:

> Furthermore, the work that they [Suaudeau and Ito] were doing was not experimental as to the invention. They were not trying to further refine the invention and prove that it would work for its intended purpose. They would not have been using it if it was not suitable for its intended purpose. They would have found something else to use instead.

> What they were doing was making modifications that would satisfy their particular requirements, much as one might modify the engine of an automobile to produce a speed greater than that afforded by the engine that came with the automobile. That doesn't mean that the modifier is experimenting with the basic invention represented by the engine, or at least not doing so within the meaning of the public use exception.

The district court did not err in this conclusion. Neither the basic purpose of the invention, which had previously been realized by others, nor the representative claims required obtaining platelet-rich plasma suitable for preservation of hearts, which was the purpose of Suaudeau's experiments. These experiments, which Baxter alleges constituted experimental use, were directed to fine-tuning the centrifuge to work for Suaudeau's particular purpose of heart preservation, not to determining if it would work as a centrifugal blood processing apparatus, or perform a method of centrifugally processing blood, as recited in the claims and which he had already verified. Further refinement of an invention to test additional uses is not the type of experimental use that will negate a public use. *Brigance,* 792 F.2d at 1109, 229 USPQ at 991; *see also Harrington Mfg. Co. v. Powell Mfg. Co.,* 815 F.2d 1478, 1481, 2 USPQ2d 1364, 1366–67 (Fed.Cir.1986) (stating that testing a tobacco harvester to harvest lower leaves of a tobacco plant was not experimental use where the claim broadly recited removing leaves from part of a tobacco stalk and prior testing had shown efficacy in harvesting upper leaves).

■ The inventor's lack of direction or control over Suaudeau's use of the invention also supports a conclusion that the use was not experimental. One of the policies underlying experimental use as a negation of public use is allowing *an inventor* sufficient time to test an invention before applying for a patent. *Tone Bros.,* 28 F.3d at 1198, 31 USPQ2d at 1324. "The experimental use doctrine operates in the inventor's favor to allow *the inventor* to refine his invention or to assess its value relative to the time and expense of prosecuting a patent application. If it is not the inventor or someone under his control or 'surveillance' who does these things, there appears to us no reason why he should be entitled to rely upon them to avoid the statute." *See In re Hamilton,* 882 F.2d 1576, 1581, 11 USPQ2d 1890, 1894 (Fed.Cir. 1989) (discussing experimental use in the context of the on-sale bar) (emphasis in original). Providing Cullis, the inventor, with the benefit of Suaudeau's testing is thus contrary to this policy, as Suaudeau was not using or testing the invention for Cullis. *Id.* Accordingly, we hold that public testing before the critical date by a third party for his own unique purposes of an invention previously reduced to practice and obtained from someone other than the patentee, when such testing is independent of and not controlled by

the patentee, is an invalidating public use, not an experimental use.

Finally, Baxter argues that the district court erred in defining public use and relying on certain of our decisions. Having thoroughly reviewed these arguments, we conclude that the district court did not err in its application of the law to indisputable facts.

Since we hold that there is no genuine issue of material fact that the centrifuge was in public use at NIH before the critical date, we need not address whether Suaudeau's use of the centrifuge at Mass. General was also a public use before the critical date.

## CONCLUSION

We conclude that the district court did not err in determining that there were no genuine issues of material fact, that Suaudeau publicly used the invention before the critical date, and that the use was not experimental. The district court thus did not err in holding that the asserted claims of the '089 patent are invalid.

***AFFIRMED.***

PAULINE NEWMAN, Circuit Judge, dissenting.

This case relates to the status as "public use" of unpublished information used for research purposes by a person who was completely independent of the inventor of the patent-in-suit. Can such private laboratory research use, if it occurs after a laboratory "reduction to practice," serve as an invalidating "public use" bar to the patented invention of another? The panel majority so holds.

The panel majority holds that since the reduction to practice of the similar device assertedly occurred more than a year before the filing date of the patent in suit, the ensuing laboratory use of that device was a "public use" and a bar under 35 U.S.C. § 102(b). This new rule of law, that unpublished laboratory use after a reduction to practice is a public use, creates a new and mischievous category of "secret" prior art. I respectfully dissent from the court's ruling,

for it is contrary to, and misapplies, the law of 35 U.S.C. § 102.

## DISCUSSION

The inventor of the patent-in-suit is Herbert Cullis; the patent is assigned to Baxter. The now-invalidating centrifuge was designed by Dr. Yoichiro Ito, a scientist at the National Institutes of Health, at the request of another scientist, Dr. Jacques Suaudeau, who wanted a centrifuge that would not damage blood platelets for use during heart operations. After some modifications of Ito's design Dr. Suaudeau used the centrifuge in his research, taking it with him to continue his research at Massachusetts General Hospital. There was no cited use outside of the activity in Dr. Suaudeau's laboratory. The Ito device was later made the subject of a patent application, and apparently after an interference with certain aspects of the Cullis application, a patent was granted to Ito.

The panel majority holds that the Ito device was in "public use" as soon as the Ito centrifuge was reduced to practice. Assuming that there was an actual reduction to practice before the critical date—a strongly challenged assumption [1]—the patent statute and precedent do not elevate private laboratory use after a reduction to practice to "public use" under § 102(b). When the public use is unknown and unknowable information in the possession of third persons, 35 U.S.C. § 102 accommodates such "secret prior art" only in the limited circumstances of § 102(e).

The issue here is not that of an Ito/Suaudeau personal defense as a prior user, a matter of current discussion among policymakers. On the panel majority's ruling it is irrelevant whether Cullis or Ito was the first inventor, for the Cullis patent is now held to be barred by the Suaudeau laboratory use of the Ito device, before the date of any reference publication or the filing date of any patent application. This is not a correct reading of the law. Suaudeau's use in his laboratory did not become a public use under

---

1. This fact should not have been decided adversely to Baxter on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

§ 102(b) as soon as the Ito centrifuge was reduced to practice. *Cf. W.L. Gore & Assoc., Inc. v. Garlock Inc.,* 721 F.2d 1540, 1550, 220 USPQ 303, 310 (Fed.Cir.1983) (a third person's secret commercial activity, more than one year before the patent application of another, is not a § 102(b) bar to the patent of another), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

### 35 U.S.C. § 102(a), (b)

The Ito device was described in a scientific publication, but the publication was not cited as prior art against the Cullis patent, apparently because of the publication date. *See In re Mulder,* 716 F.2d 1542, 1543 219 USPQ 189, 192 (Fed.Cir.1983). The panel majority does not rely on any publication or patent as a prior art reference, but on the underlying laboratory development. This use of unknown, private laboratory work to create a new bar to patentability as of the date of laboratory reduction to practice is a distortion of the law and policy set forth in 35 U.S.C. § 102. Sections 102(a) and (b) establish that prior art is prior knowledge that meets specified requirements. This new category of internal laboratory use is immune to the most painstaking documentary search. The court thus produces a perpetual cloud on any issued patent, defeating the objective standards and policy considerations embodied in the § 102 definitions of prior art.

Precedent does not support the panel majority's ruling. For example, in *In re Smith,* 714 F.2d 1127, 218 USPQ 976 (Fed.Cir.1983), relied on by the majority and by the district court, it was held that public testing of the invention with over two hundred consumers was commercial activity and was a bar under § 102(b). It is an unwarranted leap from the context of *Smith* to the private laboratory use that here occurred. It is incorrect to hold that all use after reduction to practice is ipso facto a public use, even when conducted in a private laboratory.

**2.** 35 U.S.C. § 102 A person shall be entitled to a patent unless—

(e) the invention was described in a patent granted on an application for patent by another

### 35 U.S.C. § 102(e)

Heretofore, § 102(e) was the only source of so-called "secret prior art": the patent text remains secret while the patent application is pending, but after the patent is issued its subject matter is deemed to be prior art as of its filing date.[2] *See Hazeltine Research v. Brenner,* 382 U.S. 252, 254–55, 86 S.Ct. 335, 337–38, 15 L.Ed.2d 304, 147 USPQ 429, 431 (1965) (under § 102(e) a patent is a reference as of its filing date, although its existence is not known until it issues). Thus the term "secret prior art" is used for prior art under § 102(e). This law reflects a careful balancing of public policies, for it is an exception to the rule that "prior art" is that which is available to the public. *Id.*

This retroactive effect does not reach back to the underlying research or to the date of reduction to practice of the reference patented invention. *See* § 102(e) (the patent applicant may show that his invention predates the filing date of the reference patent). It is irrelevant, as well as usually unknown, when the invention of the reference patent was reduced to practice. Such information is not discernable from the issued patent. Thus the court's ruling today adds an omnipresent pitfall to the complexities of the patent system.

### 35 U.S.C. § 102(c), (f)

There is no issue raised of abandonment under § 102(c) or derivation under § 102(f). My concern, as I have stressed, is that there is now created a new source of unknown and unknowable grounds of invalidity.

### 35 U.S.C. § 102(g)

Cullis and Ito were engaged in an interference proceeding in the PTO, in which Ito prevailed. Elaborate rules and extensive precedent govern the determination of reduction to practice under § 102(g). *See, e.g., Schendel v. Curtis,* 83 F.3d 1399, 38 USPQ2d 1743 (Fed.Cir.1996) (illustrating rigorous requirements for reduction to practice in patent interferences). Today's acquiescence in Suaudeau's purported reduction to practice,

filed in the United States before the invention thereof by the applicant for patent, . . .

based on credibility determinations and other findings unwarranted in a summary proceeding, is unburdened by the usual rigors of this determination.

The record does not explain the relationship between the Ito patent, the lost counts of the interference, and the patent in suit. However, it is not irrelevant that the PTO issued the Cullis patent despite the Ito patent, and that the information that is deemed invalidating by the panel majority was not so viewed by the PTO. The panel majority's holding today is dramatically new law. Indeed, the panel majority suggests that since Suaudeau's use after reduction to practice is public use, the Ito patent is also invalid. Ito, not a party to this case, had no chance to dispute this result.

## SUMMARY

It is incorrect to interpret 35 U.S.C. § 102(b) to mean that laboratory use after a reduction to practice is a "public use," and thus a bar against any patent application filed, by anyone, more than a year thereafter. Section 102(b) was not intended to add to the bars based on information not published or publicly known or otherwise within the definition of prior art. A non-public use does not become a public use after a reduction to practice. It is simply incorrect to interpret the laboratory use in this case as a statutory bar to a patent. I can discern no benefit to society, or to the interest of justice, in this new unreliability of the patent grant.