Rocco Anthony **MARRESE** and William T. O'Sullivan, Plaintiffs-Appellants,

v.

**RICHARD'S MEDICAL EQUIPMENT, INC.**, and Airco, Inc., Defendants-Appellees.

No. 73-1760.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1974.

Decided Oct. 21, 1974.

———◆———

Edmund A. Godula, Chicago, Ill., for plaintiffs-appellants.

Arlie O. Boswell, Jr., Dugald S. McDougall, Chicago, Ill., for defendants-appellees.

Before CLARK, Associate Justice (Ret'd.),* and PELL and SPRECHER, Circuit Judges.

CLARK, Associate Justice.

The appellants, Dr. Marrese and William T. O'Sullivan, appeal from an adverse judgment in their consolidated actions for patent infringement against Airco, Inc. and its sales agent, Richard's Medical Equipment, Inc. Appellants applied for and were jointly granted a patent covering a system for use in hospitals which prevents anaesthetic gases from escaping an anaesthesia circuit into an operating room and thus protecting the occupants of the room from such gases. The District Court after hearing the testimony of Dr. Marrese, witnessing his courtroom demonstrations of the device in controversy and hearing the testimony of three expert witnesses, in addition to studying a host of exhibits, found the patent in suit to be invalid. The detailed findings of the court declared the subject matter of the patent to be obvious under 35 U.S.C. § 103 [1]; and was known and used by others in this country before appellants' invention thereof and that its subject matter had been in public use or on sale in this country before the appellants' invention and for more than one year prior to the date on which appellants applied for a patent, under 35 U.S.C. § 102.[2] We affirm.

## 1. Background:

Air pollution in the hospital operating room caused by anaesthetic gases being released therein during an operation has been long recognized in the medical literature as a serious problem. The anaesthesia is most commonly administered in what is called a semi-closed system wherein excess volumes of oxygen and anaesthetic gases are recirculated, the patient re-breathing the gas after the carbon dioxide is removed in a canister. Since far more volumes of gas are used than are required, the excess

---

* Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

1. § 103:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. (July 19, 1952, ch. 950, 66 Stat. 798)."

2. § 102:

"A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ."

must be periodically discharged from the circuit. This was conventionally done by discharging it through the "pop-off" valve into the operating room. The pop-off valve is preset by a spring or other means which permits the discharge of gases into the room when pressures exceed a predetermined level.

In the early stages the gases used were explosive and by expelling them into the open room, a dangerous condition was created. A leading British medical journal, *The Lancet*, in an article by Bullough, took note of such dangers as early as 1954 and proposed a solution. Bullough inserted a "T junction" in the anaesthesia line adjacent to the pop-off valve with its "vertical limb" connected to a pipe extending outside the operating room; an adjustable valve controlled the flow of gases. The pop-off valve was shut tight, and this enabled the gas to flow into the "T junction" and to the pipe extending outside the operating room. A subsequent article in the same journal in 1966 pointed out that while the gas was then non-explosive, it did present health hazards when directly released into the operating room. The author was concerned with liver damage to occupants of the room who were continuously exposed to such gases. Numerous other articles called attention to the health hazards involved in the indiscriminate venting of halogenated anaesthetic gases into operating rooms, including one by McIntyre, et al, in the *Canadian Anaesthetists Society Journal*.

In April, 1945, Foregger had its research director design an anaesthesia system for Duke University. It had a gas-collector device connected to the pop-off valve that took the gas outside the operating room. Duke never ordered a Foregger system, but the system is on the market today.

In August, 1965, Dr. Carter, a practicing anaesthesiologist at Hamot Hospital in Erie, Pennsylvania, became ill with hepatitis due to inhalation of gases from the operating room. Thereafter its Chief Anaesthesiologist, Robert Byers,

and Dr. Carter reviewed the literature on the excess gases released in operating rooms but found no apparatus available to carry off the gases. They then asked Ohio Medical Products Division of Airco to develop an apparatus that would collect the gases and direct them away from the anaesthetist. On January 4, 1966, Ohio shipped a collector ring it had made for the purpose to Hamot. Thirteen more collector rings were ordered after the first one proved successful. These collector rings remained in daily use in the operating rooms of Hamot until 1972. The Ohio gas collector rings were adapted to fit over the pop-off valve, collect the excess gases from it and direct them away from the anaesthetist's face and toward the floor of the operating room. During the period mentioned they were used successfully by various doctors on the Staff of the Hospital in thousands of operations, and no effort was made to secrete their use. In October, 1968, another inquiry to Ohio from another doctor led to his use of the Ohio collector ring. Likewise, in March 1969, a Mayo Clinic technician met with Ohio's Vice President, and urged that its device for collecting such gases be improved and added to Ohio's regular sales line. An improved gas collection device was sold to Hamot and was publicly exhibited in October, 1969, in San Francisco.

In 1966 Dr. Rowley, a practicing anaesthesiologist in Concord, California, wrote Dupaco and asked it to design a device for collecting gases from the pop-off valve and taking them out of the room. The device included a cup fitted around the exhaust valve with a hose device running to an outlet in the side wall of the operating room. The suction drew room air down through the cup and carried away the waste gases escaping from the valve. It carried away 90 percent of the excess gases, and the remaining ten percent was captured by placing a rubber surgical glove over the top of the cup with a clamp keeping the glove in proper position. In 1970 a Stanford University doctor recom-

mended that Dupaco market its system, and it placed a covering over the cup and added a vacuum regulator to the system. It was then put on the market.

## 2. *The Claim of the Appellants:*

Dr. Marrese became interested in the problem in April, 1967. He conceived the notion of placing a bladder around the pop-off valve. However, the bladder idea was abandoned and the apparatus in suit was developed. Subsequently a company was formed by Marrese and O'Sullivan, known as "Marosul". The application for a patent was filed on January 10, 1969, and was granted on April 20, 1971. The application covered both modes of operation, i. e., the conventional discharge of gas through the pop-off valve into the operating room and a closed system that carried the gas out of the room, permitting the doctor to use whichever he wished. The closed system was effected by mounting a diverting body member to the housing of the pop-off valve. Excessive gases could then be moved into this gas through the diverting body to a tube which was connected to the suction fitting on the wall which sucked the gas into the central vacuum system in the hospital.

## 3. *Appellants' Subject Matter was Obvious:*

■■ We find after a careful review of the record [3] that appellants' apparatus was obvious in light of the Bullough and other articles. The two systems—Bullough and appellants—are not identical but they are twins. It is true that Bullough had no suction withdrawal but that was taught in the prior art by McIntyre. Dupaco also used suction with

his cup-type gas collector. (Finding 37 at A 130, 131). In addition the Robinson patent teaches withdrawal of gases for analysis but after going through that process the gases were carried off by a suction line to a safe disposal place, rather than being released in a room. (Finding 38). There may be a distinction present, but it is without a difference. Likewise, the Benzel patent taught the method of using a suction hose to carry off waste gases.

Appellants make much of the fact that the early gas collector apparatus leaked. But this was not an inherent problem; it was the result of poor construction. Indeed, Bullough had earlier called on the manufacturers to correct leaking defects in his apparatus. Moreover Bullough had used his device for three years both with success and without mishap. The Ohio collector ring had also been used in thousands of operations successfully. The stature of appellants' claim is indicated by the fact that a rubber glove was able to stop the leaking gas around the connection in an earlier apparatus.

## 4. *Prior Public Use Renders Appellants' Apparatus Invalid:*

■ As we have seen, the Ohio and Dupaco gas evacuation devices had accomplished the identical purpose of the appellants in a substantially similar manner long before the latter entered the field. The former enjoyed years of successful use at two different hospitals long prior to appellants' patent being issued. Appellants claim that the usage at these hospitals was "not public" under the statute. However, the authorities are to the contrary. Electric Stor-

---

**3.** The appellants insist that they need not meet the requirements of Rule 52(a) as to the findings being clearly erroneous because they were essentially based on documentary evidence. We cannot agree since some of the testimony—even of Dr. Marrese—as well as of the three experts, was crucial to the issue of infringement. For example, the testimony as to public use prior to appellants' invention was indispensable; and the fact that Dupaco's device was 90 percent efficient as to escaping gas was based entirely

on oral testimony. However, we carefully studied the record because it appeared that the findings were prepared by counsel and adopted by the trial court. We felt it our obligation to make sure that the findings were supported by substantial evidence. We found that they not only had that support but we were left "with the definite and firm conviction" that no mistake was made by the trial court in this regard. United States v. United States Gypsum, 333 U.S. 364, 395, 68 S.Ct. 525, 942, 92 L.Ed. 746 (1948).

age Battery v. Shimadzu, 307 U.S. 5, 17, 613, 616, 59 S.Ct. 675, 83 L.Ed. 1071 (1939); Randolph v. Allis-Chalmers Mfg. Co., 264 F.2d 533, 535 (7th Cir. 1959); Magnetics, Inc. v. Arnold Engineering Co., 438 F.2d 72, 74 (7th Cir. 1971). Also cf. Applicability of the Public Use Bar Provision of 35 U.S.C. 102(b) to Patentability of a Completed Invention Used at a Government Installation, by Paul F. McCaul, 56 Journal of Patent Office Society, 143; March 1974.

5. *Assuming Validity, Ohio Accused Devices do not Infringe:*

The District Court held that even if the appellants' patent be found valid, Ohio's accused device would not be an infringement. However, in light of our other holdings, we do not find it necessary for us to pass on this issue and we do not do so. The judgment is

Affirmed.